**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:21-cv-1594</u>

MILLENNIUM FUNDING, INC.,
211 PRODUCTIONS, INC.,
BEDEVILED LLC,
BODYGUARD PRODUCTIONS, INC.,
DAY OF DEAD PRODUCTIONS, INC.,
FAMILY OF THE YEAR PRODUCTIONS, LLC,
HUNTER KILLER PRODUCTIONS, INC.,
I AM WRATH PRODUCTION, INC.,
KILLING LINK DISTRIBUTION, LLC,
LHF PRODUCTIONS, INC.,
MILLENNIUM IP, INC.,
MILLENNIUM MEDIA, INC.,
MILLENNIUM SPVH, INC.,
MON, LLC,
RAMBO V PRODUCTIONS, INC.,
SF FILM, LLC,
VENICE PI, LLC, and
VOLTAGE HOLDINGS, LLC,

   Plaintiffs,

v.

MICFO, LLC, and
AMIR GOLESTAN,

   Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

   Plaintiffs MILLENNIUM FUNDING, INC., 211 PRODUCTIONS, INC., BEDEVILED

LLC, BODYGUARD PRODUCTIONS, INC., DAY OF DEAD PRODUCTIONS, INC.,

FAMILY OF THE YEAR PRODUCTIONS, LLC, HUNTER KILLER PRODUCTIONS, INC.,

20-023W

I AM WRATH PRODUCTION, INC., KILLING LINK DISTRIBUTION, LLC, LHF PRODUCTIONS, INC., MILLENNIUM IP, INC., MILLENNIUM MEDIA, INC., MILLENNIUM SPVH, INC., MON, LLC, RAMBO V PRODUCTIONS, INC., SF FILM, LLC, VENICE PI, LLC, and VOLTAGE HOLDINGS, LLC ("Plaintiffs") file this Complaint against Defendants MICFO, LLC. and AMIR GOLESTAN ("Defendants") and allege as follows:

## I.     NATURE OF THE ACTION

1.     This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.     The Plaintiffs allege that Defendants are secondarily liable for direct copyright infringement in violation of 17 U.S.C. §§ 106 and 501.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

4.     Defendants solicit, transact, and/or do business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.  As such, Defendants have sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over them.

5.     Defendants advertise that their data center facilities are strategically positioned for maximum speed, flexibility and proximity to end-users, and that one of their data center facilities being in Denver, Colorado as of January of 2020.

20-023Q



## North America

| | | |
|---|---|---|
| Atlanta, GA | Baltimore, MD | *Birmingham, AL |
| Boston, MA | Charlotte, NC | Chicago, IL |
| Cleveland, OH | Clifton, NJ | Denver, CO |
| Dallas, TX | *Detroit, MI | *Kansas City, KS |
| Las Vegas, NV | *Little Rock, AR | Los Angeles, CA |
| Louisville, KY | Miami, FL | Minneapolis, MN |
| Nashville, TN | New Orleans, LA | New York City, NY |
| Philadelphia, PA | Phoenix, AZ | Portland, OR |
| Richmond, VA | Salt Lake City, UT | San Francisco, CA |
| Santa Clara, CA | Seattle, WA | St. Louis, MO |
| Stamford, CT | Toronto, Canada | Washington, DC |

6.      Defendants provided multiple Internet Protocol ("IP") address blocks at servers in Denver, Colorado such as, but not limited to, 146.88.193.0/24 (256 IP address) and 207.189.30.0/24 (256 IP addresses) to their subscribers.

7.      To carry out a scheme to fraudulently obtain IP addresses, Defendants created a plurality of fictitious companies, one of which (Roya Hosting, LLC) was organized under the laws of Colorado with a principal address in Denver, Colorado.

8.      Plaintiffs' injuries arise out of Defendants' forum-related activities, namely Defendants' contribution to infringements of Plaintiffs' Works at IP addresses controlled by Defendants in this District such as, for example, IP addresses 207.189.30.106, 207.189.30.161, and 146.88.193.77.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c)

because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents reside and can be found in this District.

### III.    PARTIES

### A.   The Plaintiff

10.    The Plaintiffs are owners of the copyrights for the motion pictures (hereafter: "Works"), respectively, as shown in Exhibit "1".

11.    Plaintiff MILLENNIUM FUNDING, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

12.    Plaintiff 211 PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

13.    Plaintiff BEDEVILED LLC is a California limited liability company with its principal place of business at 18823 Belshire Ave Cerritos, CA 90703.

14.    Plaintiff BODYGUARD PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

15.    Plaintiff DAY OF THE DEAD PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

16.    Plaintiff FAMILY OF THE YEAR PRODUCTIONS, LLC is a Louisiana

20-023Q

limited liability company with its principal place of business at 9043 Burroughs Rd., Los Angeles, CA 90046.

17.    Plaintiff HUNTER KILLER PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

18.    Plaintiff I AM WRATH PRODUCTIONS, INC. is a California corporation with its principal place of business at 1901 Ave of the Stars Suite 1050, Los Angeles, CA 90067.

19.    Plaintiff KILLING LINK DISTRIBUTION, LLC is a California limited liability company with its principal place of business at 9190 Olympic Blvd. Suite 400, Beverly Hills, CA 90212.

20.    Plaintiff LHF PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

21.    Plaintiff MILLENNIUM IP, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

22.    Plaintiff MILLENNIUM MEDIA, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

23.    Plaintiff MILLENNIUM SPVH, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

24.    Plaintiff MON, LLC is a California limited liability company with its principal place of business at 215 1/2 Arnaz Drive Beverly Hills, CA 90211.

25.    Plaintiff RAMBO V PRODUCTIONS, INC. is a Nevada corporation with its

20-023Q

principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

26.    Plaintiff SF FILM, LLC is a New York limited liability company with its principal place of business at 90 State Street Ste 700, Office 40 Albany, New York 12207.

27.    Plaintiff VENICE PI, LLC is a California limited liability company with its principal place of business at 116 N Robertson Blvd Ste #200, Los Angeles, CA 90048.

28.    Plaintiff VOLTAGE HOLDINGS, LLC is a Nevada limited liability company with its principal place of business at 116 N. Robertson Blvd, Suite 200, Los Angeles, CA 90048.

29.    Plaintiffs are producers of popular motion pictures currently available for sale online and in brick and mortar retail stores. Many of these critically acclaimed motion pictures were released in theaters throughout the world and feature A-list actors such as Matthew McConaughey, Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, and Angela Basset, among others.

30.    Plaintiffs invested significant financial resources, time and effort in making and marketing these motion pictures based upon the expectation that they would have an opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures by subscribers of Defendants and the willful failure of Defendants to deal with this issue despite clear notice of it have hindered this opportunity.

## B.   The Defendants

31.    Defendant Micfo, LLC. ("Micfo") is, upon information and belief, a now dissolved limited liability company organized under the laws of Nevada with its principal place of operation in Charleston, South Carolina.

6

32.     Micfo operates more than 50 data centers in the world, including one in Denver, Colorado.

33.     Micfo provides "bare metal servers" and "cloud hosting" at its data centers for its subscribers.

34.     Micfo is a member of The American Registry of Internet Numbers ("ARIN"), which is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers.

35.     ARIN manages these resources within its service region, which is comprised of Canada, the United States, and many Caribbean and North Atlantic islands.

36.     Micfo is required to update the WHOIS records for the IP addresses it reassigns or reallocates to its subscribers per its registration agreement with ARIN.

37.     Defendant AMIR GOLESTAN ("Golestan") is an adult male residing, upon information and belief, in Charleston, South Carolina.

38.     Golestan is the registered agent and sole member for Micfo.

39.     Golestan closely holds Micfo.

40.     Golestan has completely disregarded corporate formalities of Micfo.

41.     Golestan effectively makes all policy decisions for Micfo, specifically including any policy regarding copyright infringement. Upon information and belief, Golestan directed Micfo's response to allegations of copyright infringement by Micfo's subscribers, including the decisions not to terminate repeat copyright infringers and to ignore notices of copyright infringement.

42.     Upon information and belief, Golestan so dominates Micfo that it has

7

become merely the alter ego to Golestan.

43.     There is such a unity of interest between Golestan and Micfo that the individuality, or separateness, of Golestan and Micfo has ceased and the facts are such that an adherence to the fiction of the separate existence of Golestan and Micfo would, under the particular circumstances, sanction a fraud or promote injustice.

44.     Golestan controls, participates in, exercises control over, or benefits from the infringements of Micfo as discussed below.

45.     Golestan has used Micfo to perpetuate a fraud on the public.

46.     Golestan has used Micfo to carry out a fraudulent scheme to obtain IP addresses from ARIN in the names of fake individuals and fictitious companies so that he could sell these IP addresses to third parties.

47.     To execute his scheme to defraud, Defendants created fake websites for the fictitious companies and fabricated the names of individual officers and employees.

48.     Defendants were indicted by a grand jury in Charleston, South Carolina in May of 2019 for these fraudulent activities.  *See* 2:19-cr-441-CRI, Doc. #2 (attached as Exhibit "2").

## IV.     JOINDER

49.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the use of Micfo's services by its subscribers for infringing the copyrights in Plaintiffs' Works, (ii) the contribution to said copyright infringements by Micfo, (iii); and (b) that there

20-023Q

are common questions of law and fact.

50.     Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiffs assert that the contributory infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.

51.     Plaintiffs assert a right of relief against the Defendants jointly and severally.

## V.     FACTUAL BACKGROUND

### A.  The Plaintiffs Own the Copyrights to the Works

52.     The Plaintiffs are the owner of the copyrights in the motion pictures ("Works") as shown in Exhibit "1".  The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.

53.     Defendants had notice of Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

54.     Defendants also had notice of Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

55.     Defendants also had notice of Plaintiffs' rights through notices that were sent to Micfo's abuse contact.

56.     The Works are motion pictures currently offered for sale in commerce.

### B. Defendants' subscribers Infringe Plaintiffs' Copyrights.

57.     Defendants' subscribers include, upon information and belief, Virtual

20-023Q

Private Network ("VPN") service providers.

58.     Customers of Defendant' subscribers ("end users") use BitTorrent to infringe Plaintiffs' exclusive rights of reproduction and distribution.

59.     Defendants' subscribers distribute Plaintiffs' Works for these end users in violation of Plaintiffs' exclusive right of distribution.

60.     BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

61.     The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

### 1.  The Initial Seed, Torrent, Hash and Tracker

62.     A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

63.     The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

64.     The initial seeder often modifies the file title of the Work to include a wording such as "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies

20-023Q

in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

65.     The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

66.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

67.     When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

68.     Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

69.     The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

70.     The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

20-023Q

71.     Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 2. Torrent Sites

72.     "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol. There are numerous torrent websites including the notorious YTS and RARBG websites.

73.     The YTS and RARBG websites were noted by the Office of the United States Trade Representative ("USTR") as examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See* USTR, *2014 Out-of-Cycle Review of Notorious Markets*, Mar. 5, 2015, pg. 17, Available at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.pdf [last accessed on May 7, 2021]; *see also* USTR, *2018 Out-of-Cycle Review of Notorious Markets*, April 2019, pgs. 24, 27 Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7, 2021].

### 3. End users access the torrent sites and pirate from Micfo IP addresses

74.     End users accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Micfo.

### 4. The Peer Identification

75.     The BitTorrent Client will assign an identification referred to as a Peer ID to the computer so that it can share content (here the copyrighted Work) with other peers.

### 5. Uploading and Downloading a Work Through a BitTorrent Swarm

76.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

77.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.  Defendants' subscribers transmit the pieces to the peers.

78.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.   Defendants' subscribers transmit the pieces to the peers.

79.     In this way, all of the peers and seeders are working together in what is called a "swarm."

80.     Here, the end users (customers of Defendants' subscribers) participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiffs' Works.

81.     Defendants' subscribers distributed the end users' transmissions to other members of the swarm.

82.     In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a

20-023Q

different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

83.    Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

***6. The Plaintiffs' Computer Investigator Identified Micfo's IP Addresses as Participants in Swarms That Were Distributing Plaintiffs' Copyrighted Works.***

84.    The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiffs' copyrighted Works.

85.    MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

86.    MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

87.    The IP addresses, Unique Hash Numbers, and hit dates contained in MEU's evidence logs show that Defendants' subscribers distributed pieces of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.

14

20-023Q

88.     End users' computers used Micfo's IP addresses to connect to the investigative server in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

89.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works.

90.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

### C. Defendants' subscribers distributed copies of Plaintiffs' Works.

91.     Defendants' subscribers distributed at least pieces of each of Plaintiffs' Works over network connections to other peers in the Swarm from the IP addresses at servers Defendants provided.

### D.   Defendants' subscribers promote and encourage their end users to pirate copyright protected Works including Plaintiffs'.

92.     Micfo's VPN customers promote their services for the purpose of infringement.

93.     Micfo's subscriber Privax Limited dba HideMyAss ("HMA") describes its VPN service as "PERFECT FOR STREAMING AND P2P".

20-023Q



94.     Micfo's subscriber HMA advertises providing servers that are "optimized for P2P".

95.     Micfo's subscriber HMA promotes it service as being optimized for using the notorious piracy application "Popcorn Time".



***E.     Defendants had knowledge that their subscribers were infringing Plaintiffs' Works and distributing file copies of the Works but continued to***

16

20-023Q

***provide service to their subscribers***

96.     Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

97.     Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.  *See* Exhibit "3" (excerpt below).

Protocol: BITTORRENT
Infringed Work: Angel Has Fallen
Infringing FileName: Angel.Has.Fallen.2019.HDRip.XviD.AC3-EVO
Infringing FileSize: 1494813692
Infringer's IP Address: 209.209.238.37
Infringer's Port: 54121
Initial Infringement Timestamp: 2020-02-15 13:36:43

98.     MEU determines the proper abuse contact email address for the service provider assigned the IP addresses at issue from publicly available information from ARIN.

99.     Plaintiffs' agent sends the Notice to the abuse contact email address.

100.    Micfo is a member of ARIN and receives IP addresses from ARIN.

101.    Micfo is required to update the WHOIS records for the IP addresses it reassigns or reallocates per its registration agreement with ARIN.

102.    Plaintiffs' agent has sent over 2800 Notices to Micfo concerning infringements of copyright protected Works including Plaintiffs' at IP addresses assigned

20-023Q

to Micfo from ARIN.

103.   Micfo failed to update the ARIN records to show that these IP addresses were reassigned to its subscribers.

104.   For example, Plaintiffs' agent sent over 600 Notices to Micfo concerning infringement of the motion picture *Angel Has Fallen* at IP addresses assigned to Micfo from ARIN.

105.   Plaintiffs' agent sent 40 Notices to Micfo concerning observed infringements at each of IP addresses 209.209.238.37, 209.209.232.3, 209.209.238.36, and 209.209.232.4 (total of over 200 Notices for these four IP addresses).

106.   Upon information and belief, other rightsholders had similar Notices sent to Micfo concerning infringing activity at IP addresses assigned to Micfo from ARIN.

107.   Micfo failed to terminate the subscribers or the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

108.   Micfo failed to even forward the Notices to its subscribers.

109.   Micfo continued to provide service to the subscribers despite knowledge that its subscribers were using the service to engage and facilitate massive piracy of copyright protected Works including the Copyright Plaintiffs'.

***F. Defendants' fraudulent scheme to obscure their ownership of IP addresses hindered Plaintiffs from sending Notices to Defendants.***

110.   Golestan created fictitious companies in his scheme to fraudulently obtain over 750,000 IP addresses from ARIN.

20-023Q

111.    Defendants created fake websites for the fictitious companies and fabricated the names of individual officers and employees.

112.    As a result, public information showed that many of these fraudulently obtained IP addresses where Plaintiffs' Works were infringed were assigned to fictitious individuals and/or companies.

113.    Because these fictitious companies did not publish correct abuse contact or register a DMCA agent, Plaintiffs' agents' efforts to send Notices of infringements to the proper contact and prevent further infringements were hindered.

114.    For example, Golestan obtained over 8000 IP addresses including the IP address block 172.110.208.0/20 from ARIN using fictitious named company "Fairway Network" and fictitious name "Sebastian Buszewski".

115.    Defendants did not publish an abuse contact for these fictitious companies such as Fairway Network.

### G. Micfo controls the conduct of its subscribers.

116.    Micfo can terminate the accounts of its' subscribers at any time.

117.    Some entities publicly identified as subscribers of Micfo are aliases for Golestan and/or fictitious entities created by Golestan to fraudulently obtain more IP addresses from ARIN to sell for profit.

118.    Golestan completely controls the following so-called subscribers: Contina; Virtuzo; Oppobox; Telentia; Univera Network/HostAware; Roya Hosting; Host Bang; Hyper VPN; Fiber Galaxy; Cloudiac; and Fairway Network.

119.    Upon information and belief, Micfo promptly terminates subscriber

20-023Q

accounts    when    said    subscribers    failed    to    pay    for    the    Service.



*See* Decl. of Joshua Lee at ¶4.

120.    Micfo monitors its subscribers' access to its service.   For example, Micfo

monitors    spamming,    resource    usage,    and    web    content.





### 7. SPAMMING

7.1 Micfo takes a zero tolerance approach to the sending of Unsolicited Commercial Email or SPAM over its network. The Client agrees to not utilize Micfo Services in any manner to Spam and/or send unsolicited bulk e-mails. In the event that any Client breaches or fails to comply with any/or part of provisions set out in clause 7.1, Micfo retains the right to suspend and/or terminate the Client's Hosting Services.



any prior notice.

### 11. SERVICE SUSPENSION

11.1 A violation of clause 5.2 will result in immediate suspension of Client's Service, including without limitation Shared Hosting and/or Reseller Hosting with or without prior notice to the Client.

11.2 In extreme circumstances, and in an effort to prevent the misuse of Server Resources, Micfo will immediately suspend Client's Services including without limitation Shared Hosting and/or Reseller Hosting which is in violation of clause 6.2. Micfo will remain the sole arbiter as to what constitutes a violation of this policy.

11.3 Micfo shall immediately suspend the Clients Services in the event that the Client is found to have defaulted its payment obligations towards Micfo as set out in Clause 3.6.2.

11.4 Micfo reserves the right to immediately suspend and/or terminate the Client's Services in the event that the Client is in violation of Clause 3.11.

11.5 As set out in Clause 21.7, Micfo reserves the right to suspend any/or all the Client's Services with immediate effect. Micfo shall be under no obligation to send any prior notice to the Client.



### 5. HOSTING SERVICE RESTRICTIONS

5.1 Micfo's Hosting Services are restricted by Bandwidth, Disk Space and Web Content.

5.2 The Client shall not use Micfo's Shared Hosting and/or Reseller Hosting resources including without limitation Bandwidth, Disk Space and Web Content as:

    5.2.1 An alternative solution to file and/or data storage.

    5.2.2 An audio and/or video streaming Website.

*See Id.* at ¶¶4-5.

### H. Defendants do not have a safe harbor from liability.

121.    As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

122.    Defendants do not have a policy of terminating repeat infringers.

123.    Plaintiffs' agent has sent over 2,800 Notices to Micfo concerning infringements at IP addresses Micfo publishes as assigned to it.

124.    Micfo has failed to terminate the accounts and/or take any meaningful actions against its subscribers in response to these Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

125.    Congress created a safe harbor that limits the liability of a service provider for copyright infringement "...by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider" does not have the requisite knowledge, "...responds expeditiously to remove or disable access to, the material..." and has the appropriate designated agent

20-023Q

for receiving notices.  17 U.S.C. § 512(c)(1), (2).

126.   Micfo leases use of its servers to its subscribers so that the subscribers can host VPN networks on Micfo's servers.

127.   Micfo's subscribers store copies of Plaintiffs' Works on Micfo's servers and use Micfo's servers to distribute copies of Plaintiffs' Works.

128.   The over 2800 Notices Plaintiffs' agent sent to Micfo concerning infringements included information such as the IP addresses that Micfo could have use to disable access to infringing material.

129.   Micfo failed to respond and expeditiously to remove or disable access to the material in response to the over 2,800 Notices Plaintiffs' agent sent to Sharktech.

130.   Micfo failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

131.   Defendants' fraudulent conduct in obtaining IP addresses in the names of fictitious individuals and entities does not provide a safe harbor from liability.

132.   Micfo's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

### *I. The copyright infringements arise from Defendants' advertisements.*

133.   Micfo prominently advertise its multiple locations to "ensure your content travels   shorter   distance,   data   processes   at   lightning   fast   speed".

20-023Q



*See* Decl. of Joshua Lee at ¶6.

134.   Defendants      advertise      specifically      to      VPN      customers.



*See Id.* at ¶7.

     135.    Defendants quote the Chief Operating Officer of its customer VPN provider Privax Limited d/b/a "Hide My Ass" to promote its services to other VPN service providers.



> " It is very important that our suppliers are providing us with solid servers with good connections.
>
> We are very happy with the service that we've had with Micfo. "
>
> *Danvers Baillieu, COO at Privax Limited (HideMyAss!)*

*Id.*

136.    Defendants advertise that Micfo has 10,000,000+ Geolocated IP Addresses on its VPN advertisement page.



*Id.*

137.    Defendants advertise "zero congestion" for their customers.

20-023Q



*See Id.* at ¶5.

138.    Defendants' subscribers are motivated to become customers from Micfo's advertisements.

139.    Defendants' subscribers are motivated to become customers from the knowledge of Defendants' practice of ignoring notices of infringements or failing to take any meaningful action.

### VI. FIRST CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon material contribution)

140.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

141.    Through its activities, Micfo knowingly and intentionally took steps that are substantially certain to result in direct infringement of Copyright Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

142.    Despite Micfo's knowledge that its subscribers were using its service to

20-023Q

engage in widescale copyright infringements, Micfo has failed to take reasonable steps to minimize the infringing capabilities of its service.

143.   Micfo is liable as contributory copyright infringers for the infringing acts of its subscribers.  Micfo has actual and constructive knowledge of the infringing activity of its subscribers.  Micfo knowingly caused and otherwise materially contributed to these unauthorized distributions of Copyright Plaintiffs' Works.

144.   Micfo's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

145.   By engaging in the contributory infringement alleged in this Complaint, Micfo deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  Micfo's misconduct therefore offends public policy.

146.   Micfo and Golestan are merely alter egos, and thus Golestan is liable for the acts of Micfo.

147.   Golestan personally controls, participates in, exercises control over, or benefits from the infringements of Micfo and thus Golestan is liable for the acts of Micfo.

## VII. SECOND CLAIM FOR RELIEF
### (Vicarious Infringement)

148.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

149.   Micfo is vicariously liable for the infringing acts of its subscribers'

20-023Q

infringements including but not limited to the subscribers' direct infringements of Plaintiffs' exclusive right to distribute copies of their Works.

150.   Micfo has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

151.   Mico has refused to take any meaningful action to prevent the widespread infringement by its subscribers despite having actual knowledge.  Indeed, the ability of subscribers to use Micfo's service to distribute copies of Plaintiffs' Works while concealing their end users' identities acts as a powerful draw for users of Micfo's service.

152.   Micfo is therefore vicariously liable for the unauthorized distribution of Plaintiffs' Works.

153.   Micfo and Golestan are merely alter egos, and thus Golestan is liable for the acts of Micfo.

154.   Golestan personally controls, participates in, exercises control over, or benefits from the infringements of Micfo and thus Golestan is liable for the acts of Micfo.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

(A) enter permanent injunctions enjoining Defendants from continuing to contribute to infringements of the Plaintiffs' copyrighted Works;

(B) order Defendants to adopt a policy that provides for the prompt termination of subscribers that engage in more than three infringements of copyright protected Works;

(C) order Defendants to block subscribers from accessing notorious piracy

20-023Q

websites of foreign origin that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government such as (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; and (e) Popcorntime on networks under their control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol;

(D) award the Plaintiffs their actual damages from the copyright infringements and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for statutory damages pursuant to 17 U.S.C. § 504(a) and (c) against Defendants jointly and severally;

(E) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

(F) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, June 11, 2021.

/s/ Joshua Lee
Joshua Lee
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:   (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:         kculpepper@culpepperip.com
Attorney for Plaintiffs

20-023Q